Christopher L. Lebsock (#184546)
HAUSFELD LLP
580 California Street, 12th Floor
San Francisco, CA 94101
Telephone: (415) 633-1908
Facsimile: (415) 358-4980
clebsock@hausfeld.com

*Counsel for Plaintiffs Earth's Healing, Inc. & Redbud Roots Inc.*

Dennis Stewart (#99152)
GUSTAFSON GLUEK PLLC
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 595-3299
dstewart@gustafsongluek.com

*Counsel for Plaintiff Chillworx, LLC*

*(Additional Counsel Appear on Signature Page)*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *IN RE CCELL CLOSED CANNABIS OIL VAPORIZATION SYSTEMS AND COMPONENTS PRODUCTS ANTITRUST LITIGATION* | Case No. 25-md-3161 |

## DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

I.   INTRODUCTION ....................................................................................................... 1

II.  JURISDICTION AND VENUE ................................................................................. 5

III. PARTIES ..................................................................................................................... 6

  A.  DIRECT PURCHASER PLAINTIFFS ............................................................................. 6

  B.  DEFENDANTS .......................................................................................................... 6

IV.  AGENTS AND CO-CONSPIRATORS ..................................................................... 7

V.   CLASS ACTION ALLEGATIONS ........................................................................... 8

VI.  FACTUAL ALLEGATIONS ................................................................................... 10

  A.  THE UNITED STATES VAPE MARKET ...................................................................... 10

    1.  *The Emergence of a New Market* ................................................................... 10

      i.   CCELL's Launch ...................................................................................... 12

      ii.  The Expansion of CCELL's Distributor Network .................................... 13

    2.  *The Vape Supply Chain in the United States* ................................................ 15

    3.  *Vapes Available in the United States Today* ................................................. 17

  B.  DEFENDANTS' UNLAWFUL HORIZONTAL AGREEMENT ........................................... 19

      i.   Adoption .................................................................................................. 19

      ii.  Implementation ........................................................................................ 20

      iii. Monitoring and Enforcement ................................................................... 23

  C.  DEFENDANTS' AGREEMENT HAD ACTUAL ANTICOMPETITIVE EFFECTS ............... 24

  D.  DEFENDANTS' OTHER EXCLUSIONARY CONDUCT ................................................. 25

  E.  THE STRUCTURE AND CHARACTERISTICS OF THE WHOLESALE DISTRIBUTION OF VAPES IN THE UNITED STATES ...................................................................................................... 30

    1.  *The Wholesale Market for Unfilled Vapes in the United States is Highly Concentrated, with Defendant Smoore Being the Dominant Manufacturer and the Distributor Defendants Being the Dominant Distributors.* ............................................................................... 30

    2.  *Barriers to Entry are High* ............................................................................ 31

    3.  *Demand for Vapes is Inelastic* ...................................................................... 32

    4.  *There Were Numerous Opportunities for Defendants to Collude* ................ 32

  F.  INTERSTATE TRADE AND COMMERCE .................................................................... 33

VII. TOLLING OF THE STATUTES OF LIMITATIONS ........................................... 33

  A.  DPPs COULD NOT HAVE DISCOVERED THEIR INJURY WITHIN FOUR YEARS OF FILING THIS COMPLAINT ............................................................................................................... 33

  B.  IN THE ALTERNATIVE, DEFENDANTS FRAUDULENTLY CONCEALED THEIR

ANTICOMPETITIVE AGREEMENT...........................................................................................33

C.    IN THE ALTERNATIVE, THE CONTINUING VIOLATION DOCTRINE APPLIES ........................ 34

**VIII. RELEVANT MARKET**............................................................................................................35

A.    RELEVANT PRODUCT MARKET ............................................................................................ 35

B.    RELEVANT GEOGRAPHIC MARKET....................................................................................... 36

C.    DEFENDANTS' MARKET POWER........................................................................................... 36

**IX.  CLAIMS FOR RELIEF**...........................................................................................................37

**PRAYER FOR RELIEF**..................................................................................................................43

**JURY TRIAL DEMANDED**...........................................................................................................45

## TABLE OF FIGURES

Figure 1: Group Photo of Defendants' Joint Meeting ..................................................................... 3

Figure 2: Marijuana Legalization in the United States ................................................................... 11

Figure 3: Jupiter's April 10, 2018 X Post ...................................................................................... 13

Figure 4: 3Win Becomes an Authorized Distributor (2016) .......................................................... 14

Figure 5: CB Solutions Becomes an Authorized Distributor (2017)............................................. 14

Figure 6: KushCo Becomes an Authorized Distributor (2018) ..................................................... 15

Figure 7: Defendants' United States Vape Supply Chain............................................................... 17

Figure 8: 510-Threaded Vape Assembly ....................................................................................... 18

Figure 9: Pod System Vape Assemblies ........................................................................................ 18

Figure 10: All-In-One Vapes  ........................................................................................................ 18

Figure 11: All Defendant In-Person Meeting (Presentation by KushCo CEO, Nick Kovacevich, to All Defendants)....................................................................................................................... 22

Figure 12: All Defendant In-Person Meeting (Presentation by Jupiter COO, Joseph Barberio, to All Defendants) ..................................................................................................................... 22

Figure 13: All Defendant In-Person Meeting (Presentation by Unknown Smoore Employee to All Defendants)....................................................................................................................... 22

Figure 14: All Defendant In-Person Meeting (CB Solution CEO, Danny Allen, with Smoore's Head of North American Sales, Shallyn Lin, and Others)........................................................ 23

Figure 15: All Defendant In-Person Meeting (Presentation by 3Win CEO, Chris Sinacori, to All Defendants) ..................................................................................................................... 23

Table 1: Status of ITC Respondents .............................................................................................. 27

Plaintiffs, Earth Healings, Inc. ("Earth's Healing"), Redbud Roots Inc. ("Redbud"), and Chillworx, LLC d/b/a Honey Oil ("Chillworx," and with Earth's Healing and Redbud, "Direct Purchaser Plaintiffs" or "DPPs") on behalf of themselves and a Class of direct purchasers of CCELL-branded (short for "Ceramic Cell") closed cannabis oil vaporizer systems and components ("Vapes") sold by Defendant Shenzhen Smoore Technology Co. Ltd. ("Smoore") or its authorized distributors—Jupiter Research LLC ("Jupiter"); Greenlane Holdings, Inc. ("Greenlane"),[1] both for its own actions and for the actions of its predecessor in interest, KushCo Holdings, Inc. ("KushCo"); 3Win Corp. ("3Win"); and CB Solutions, LLC d/b/a Canna Brand Solutions ("CB Solutions," and with Jupiter, Greenlane/KushCo, and 3Win, the "Distributor Defendants," and with Smoore, the "Defendants")—in the United States and its territories between at least December 1, 2016 and until the effects of the conspiracy have ceased (the "Class Period"),[2] bring this Consolidated Amended Class Action Complaint for damages and equitable relief against Defendants for violations of Sections 1 & 3 of the Sherman Act (15 U.S.C. §§ 1 & 3), California's Cartwright Act (Cal. Bus. & Prof. Code §§ 16720, *et seq.*), and California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*).[3] All allegations herein other than those concerning DPPs are based on information and belief.

## I. **INTRODUCTION**

1. This lawsuit arises from Defendant Smoore and the Distributor Defendants' unlawful agreement not to compete with one another. Defendants are horizontal competitors at the distribution level (*i.e.*, the level at which DPPs and members of the putative Class and Sub-Class purchased CCELL-branded Vapes), and their agreement is therefore a *per se* violation of Sections

---

[1]  DPPs previously named "Greenlane Holdings, LLC" as a defendant in this action; however, counsel for this defendant has represented that "Greenlane Holdings, Inc." is the appropriate party to this suit. *See* ECF No. 40 ("Greenlane Holdings, Inc. (erroneously sued as Greenlane Holdings, LLC)").

[2]  DPPs reserve the right to amend the Class Period to encompass a longer (or shorter) period of time based on the discovery to be taken in this action.

[3]  This amendment is made pursuant to this Court's December 12, 2025 order granting DPPs permission to substitute in a new California-based named plaintiff. *See* ECF No. 35. DPPs have made no changes other than those necessary to accomplish this substitution, and DPPs reserve the right to "seek leave to add back a *per se* claim if discovery on the surviving claim gives them a good faith basis to be believe they can allege one." No. 25-cv-1428, ECF No. 89 at 3.

---

1 and 3 of the Sherman Act (15 U.S.C. §§ 1 & 3) and California's Cartwright Act (Cal. Bus. & Prof. Code §§ 16720, *et seq.*), as well as a violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*).

2. Defendant Smoore is a Chinese company. At all relevant times, Smoore has been the dominant manufacturer of Vapes sold in the United States, which it markets using the "CCELL" brand name. Smoore holds itself out as the "world's leading atomization technology company" and "the world's largest vaping technology manufacturer."

3. Throughout the Class Period, Smoore has sold CCELL-branded Vapes in the United States both directly and through the Distributor Defendants.[4] Indeed, in its recently-filed Answer to another Vape manufacturer's antitrust counterclaims, "Smoore admit[ted] that it sells cannabis vaporizer hardware through distributors, and to a lesser extent, directly to some cannabis oil producers."[5] That is, it is uncontested that Smoore has been both a supplier to and competitor with the Distributor Defendants in the wholesale distribution of Vapes sold in the United States.

4. At all relevant times, there has been no meaningful competitor(s) to Defendant Smoore and the Distributor Defendants in the United States, and Defendants have possessed and exercised significant market power in the wholesale distribution of Vapes sold in the United States.

5. Defendants' anticompetitive horizontal agreement began no later than December 1, 2016 and remains in force today. The agreement is comprised of a horizontal price-fixing and market allocation scheme, that was implemented through in-person meetings and trainings, and enforced through mandatory customer and wholesale price reporting, Distributor Defendant complaints, and the threat of financial penalties for non-compliance.

6. **Agreement.** Defendants' agreement included price-fixing and market allocation

---

[4] *See* Initial Determination of Violation of Section 337 and Recommended Determination of Remedy and Bond at 97 in *In re Certain Oil-Vaping Cartridges, Components Thereof, and Products Containing the Same*, Inv. No. 337-TA-1286 (U.S. Int'l Trade Comm'n Feb. 1, 2023) (hereinafter, "ITC Decision").

[5] Counterclaim-Defendant's Answer to Counterclaim-Plaintiff's Am. Counterclaims; Smoore's Counterclaim ¶ 59, ECF No. 100 in *Shenzhen Smoore Tech. Co., Ltd. v. Next Level Ventures, LLC and Advanced Vapor Devices LLC*, Case No. 2:22-cv-07646-AB-AGR (C.D. Cal. filed Dec. 18, 2024) (hereinafter, "Smoore Answer").

components. As to the former, Smoore and each of the Distributor Defendants entered into **written and signed agreements** concerning their sale of CCELL-branded Vapes in the United States (the "Distribution Agreements"), some or all of which contain provisions, either directly or incorporated by reference, setting minimum wholesale prices for CCELL-branded Vapes (*i.e.*, prices below which the Defendants agreed not to sell CCELL-branded Vapes to DPPs and members of the putative Class). As to the latter, Smoore and each of the Distributor Defendants agreed not to compete for each others' (including Smoore's) customers.

7.    **Implementation.** Defendants' anticompetitive scheme was implemented through trainings (at least some of which were created by Smoore) and joint, (an) in-person meeting(s) between Defendants' executives. As to the former, Defendants trained their employees to abide by the agreed-upon minimum wholesale prices and to not compete for each others' customers. As to the latter, Smoore and the Distributor Defendants' executives held one or more in-person meetings in the United States where they, among other things, confirmed the terms of their anticompetitive agreement. A picture of some of the attendees—which included high ranking executives from each of the Defendants—to one such meeting is below (**Fig. 1**):[6]



*Figure 1: Group Photo of Defendants' Joint Meeting*

*Back (Left to Right):* Joe Strain (VP of CCELL, Smoore); Unknown; Danny Allen (CEO, CB Solutions): Mark Scatterday (CEO, Jupiter); Nick Kovacevich (CEO, KushCo); Chris Sinacori (CEO, 3Win); Jim McCormick (CFO, KushCo); Joseph Barberio (COO, Jupiter); Eric Newman (Chief Sales Officer, 3Win)

*Middle (Left to Right):* Unknown (Smoore); Unknown; Paul Stremcha (Head of Sales, Jupiter); Unknown (Smoore); Jason Manasse (VP of Business Development, KushCo)

*Front (Left to Right):* Unknown (Smoore); Shallyn Lin (Head of North American Sales, Smoore); Unknown (Smoore)

---

[6]    The names and positions included below the picture are based on DPPs' good-faith investigation.

8. **Enforcement.** Defendants monitored and policed their anticompetitive agreement in at least three ways: (a) the Distributor Defendants' monthly sharing of confidential customer names and price information with Smoore, which was required by at least some of the Distributor Agreements; (b) the Distributor Defendants' reporting of potential violations to Smoore, which Smoore investigated and attempted to correct (including by contacting the alleged violator and then reporting back its findings and decision to the complaining Distributor Defendant(s)); and (c) the threat of deducting money from the security deposit the Distributor Defendants are contractually required to pay Smoore under the terms of at least some of the Distribution Agreements.

9. Defendants' anticompetitive conduct has artificially fixed the wholesale price of CCELL-branded Vapes in the United States at supra-competitive levels throughout the Class Period, and as a result, DPPs and members of the putative Class paid higher prices for CCELL-branded Vapes than they would have but for Defendants' anticompetitive conduct.

10. Notably, Defendants' anticompetitive conduct was recently challenged by another Vape manufacturer in the United States District Court for the Central District of California, and that Court, reviewing similar allegations to those pled herein, concluded that the Vape manufacturer had adequately alleged antitrust violations by Smoore.[7]

11. Defendants' price-fixing and market allocation agreement is horizontal, and thus *per se* illegal under the Sherman Act and California's Cartwright Act. First, because Smoore competes with each of the Distributor Defendants in the sale of Vapes at the wholesale distribution level (*i.e.*, sales to DPPs and members of the putative Class), Defendants' anticompetitive agreement is a horizontal restraint. *See*, *e.g.*, *Optronic Techs., Inc. v. Ningbo Sunny Elec Co.*, 20 F. 4th 466, 481 (9th Cir. 2021). Second, because Smoore organized, facilitated, and enforced a horizontal agreement between the Distributor Defendants—the dominant wholesale distributors of

---

[7] *See* Order (1) Denying Motion to Bifurcate and Stay; (2) Denying Motion to Dismiss, Except for Limited Granting-In-Part as to Certain Theories Relating to Alleged Noerr Pennington Exceptions; (3) Denying Motion to Strike Affirmative Defenses; and (4) Vacating December 6, 2024 Hearing (ECF No. 94 in *Shenzhen Smoore Tech. Co., Ltd. v. Next Level Ventures, LLC and Advanced Vapor Devices LLC*, Case No. 2:22-cv-07646-AB-AGR (C.D. Cal. filed Dec. 4, 2024) (hereinafter "NLV Mot. to Dismiss Order").

Vapes in the United States—the agreement is also a horizontal restraint. *See, e.g.*, *United States v. Gen. Motors Corp.*, 384 U.S. 127, 145 (1966).

12.    In the alternative, Defendants' agreement is a vertical restraint, which is *per se* illegal under California law and illegal under the Sherman Act because the anticompetitive effects outweigh any alleged procompetitive benefits.

13.    Through this action, DPPs, on behalf of themselves and other members of the putative Class (and DPP Chillworx on behalf of itself and the Sub-Class), seek to recover the overcharges paid by them to Defendants during the Class Period, as well as entry of an injunction requiring Defendants to cease their illegal conduct.

## II.    JURISDICTION AND VENUE

14.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1367, and personal jurisdiction pursuant to 15 U.S.C. § 22 and the doctrine of pendent personal jurisdiction, as well as the California long-arm statute (Cal. Code of Civ. Procedure § 410.10).

15.    Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391(b) and (c), because a substantial portion of the affected interstate trade and commerce was carried out in this District and/or one or more Defendants does business in this District.

16.    Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal restraint of trade in the United States and throughout this District.

17.    The anticompetitive conduct alleged herein has been directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States and in this District.

18.    Further, because this case arises under the Sherman Act, this Court has personal jurisdiction over each Defendant based on its contacts with the United States as a whole. *See Shields v. Federation Internationale de Natation*, 419 F. Supp. 3d 1188, 1202 (2019) ("There is no

dispute that the relevant forum for the Court's jurisdictional analysis in these antitrust actions is the United States as a whole, and not merely California").

## III.    PARTIES

### A.    Direct Purchaser Plaintiffs

19.    Direct Purchaser Plaintiff Earth's Healing is a corporation organized under the laws of the State of Arizona with its principal place of business in Tuscon, Arizona. During the Class Period, Earth's Healing purchased CCELL-branded Vapes directly from one or more Defendants.

20.    Direct Purchaser Plaintiff Redbud is a corporation organized under the laws of the State of Michigan with its principal place of business in Buchanan, Michigan. During the Class Period, Redbud purchased CCELL-branded Vapes directly from one or more Defendants.

21.    Direct Purchaser Plaintiff Chillworx is a limited liability company organized under the laws of the State of California with its principal place of business in San Diego, California. During the Class Period, Chillworx purchased CCELL-branded Vapes directly from one or more Defendants.

### B.    Defendants

22.    Defendant Smoore is a corporation organized under the laws of China having its principal place of business at Block 16, Dongcai Industry Park, Gushu Village, Bao'an District, Shenzhen, China. During the Class Period, Smoore sold CCELL-branded Vapes in the United States to the Distributor Defendants and directly to members of the putative Class and Sub-Class.

23.    Defendant Jupiter is an Arizona Limited Liability Company with its principal place of business located at 8825 N 23rd Avenue, Suite 100, Phoenix, Arizona 85021. During the Class Period, Jupiter sold CCELL-branded Vapes in the United States directly to members of the putative Class and Sub-Class.

24.    Defendant Greenlane is a Delaware corporation with its principal place of business at 1095 Broken Sound Parkway NW, Boca Raton, Florida 33487. In August 2021, Greenlane completed a merger with KushCo, which was formerly a Nevada corporation having its principal

place of business at 6261 Katella Ave., Suite 250, Cypress, California 90630.[8] During the Class Period, Greenlane and KushCo sold CCELL-branded Vapes in the United States directly to members of the putative Class and Sub-Class.

25.    Defendant 3Win is a Nevada corporation with its principal place of business at 7850 S. Handy Dr., Suite B122, Tempe, Arizona 85284. During the Class Period, 3Win sold CCELL-branded Vapes in the United States directly to members of the putative Class and Sub-Class.

26.    Defendant CB Solutions is a Washington Limited Liability Company with its principal place of business located at 802 134th Street SW Suite 130, Everett, Washington 98204. During the Class Period, CB Solutions sold CCELL-branded Vapes in the United States directly to members of the putative Class and Sub-Class.

## IV.    AGENTS AND CO-CONSPIRATORS

27.    The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of each Defendant's businesses or affairs.

28.    Various persons and/or firms not identified as Defendants herein may have also participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof. DPPs reserve the right to amend this Complaint to add these co-conspirators, if any, to this action at an appropriate time in the future.

29.    Each Defendant acted as the principal, agent, or joint venture of, or for, the other Defendants with respect to the acts, violations, and common course of conduct alleged by DPPs.

30.    Defendants are participants and aiders and abettors in the improper acts, plans, schemes, and transactions that are the subject of this Complaint. Defendants have participated as members of the anticompetitive scheme or acted with, or in furtherance of it, or aided or assisted in carrying out its purposes as alleged in this Complaint and have performed acts and made

---

[8]    Greenlane owns 100% of KushCo's assets and liabilities through a Delaware limited liability company called "Merger Sub Gotham 2, LLC." To the extent it becomes necessary or appropriate to add this entity (or any other) as a defendant to these proceedings, DPPs reserve the right to add it/them.

statements in furtherance of the restraints of competition set forth herein.

## V.    CLASS ACTION ALLEGATIONS

31.    DPPs bring this action for damages and equitable relief on behalf of themselves and a class of similarly situated persons and entities pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), with the Class initially defined to include the following:

> All persons or entities in the United States and its territories who purchased CCELL-branded Vapes directly from one or more Defendant(s), or their subsidiaries or affiliates, during the period at least as early as December 1, 2016, until the effects of the anticompetitive conduct ceased (the "Class Period").

> Class Representatives: All Direct Purchaser Plaintiffs

32.    The Class includes a Sub-Class (the "California Sub-Class" or "Sub-Class") initially defined to include the following:

> All persons or entities in the State of California who purchased CCELL-branded Vapes directly from one or more Defendant(s), or their subsidiaries or affiliates, during the Class Period.

> Class Representative: Chillworx

33.    Excluded from the Class and Sub-Class are the following persons or entities: (a) all persons and entities not authorized or licensed to conduct a cannabis-related business under any State's law; (b) Defendants identified herein; (c) any unnamed co-conspirators who may later be identified, if any; (d) any Defendant's (or future identified co-conspirator's, if any) parent companies, subsidiaries, and affiliates; (e) any Defendant's (or future identified co-conspirator's, if any) officers, directors, management, employees, subsidiaries, affiliates, or agents; (f) the judges and chambers staff assigned to this case, as well as the members of their immediate families; and (g) all jurors assigned to this case. DPPs reserve the right to expand, change, or modify the class definition based upon discovery and further investigation.

34.    *Numerosity.* DPPs do not know the exact number of Class members. DPPs are informed and believe that, due to the nature of the trade and commerce involved, the Class and Sub-Class are so numerous and geographically dispersed that joinder of all Class members in the prosecution of this action is impracticable.

DPPS' CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT

8

CASE NO. 25-MD-3161

35.    *Typicality.* DPPs' claims are typical of the claims of their fellow Class members because DPPs purchased CCELL-branded Vapes directly from one or more Defendants during the Class Period. DPPs and all Class members were damaged in the same manner by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all members of the Class and Sub-Class.

36.    *Commonality.* Defendants have acted on grounds generally applicable to the Class and Sub-Class, thereby making final damages and equitable relief appropriate with respect to the Class as a whole and Sub-Class as a whole. Moreover, numerous questions of law or fact common to the entire Class and Sub-Class—including, but not limited to, those identified below—arise from Defendants' anticompetitive and unlawful conduct:

(a)    Whether Defendants entered into a horizontal agreement in restraint of trade;

(b)    Whether Smoore organized, facilitated, and enforced an agreement among and between itself and the Distributor Defendants;

(c)    Whether Defendants' conduct caused the wholesale price of CCELL-branded Vapes sold in the United States to be higher than the competitive level as a result of Defendants' restraint of trade;

(d)    The duration of Defendants' anticompetitive conduct;

(e)    The identity of the participants of the alleged anticompetitive conduct;

(f)    Whether the alleged anticompetitive conduct violated the Sherman Act;

(g)    Whether DPPs and members of the Class and Sub-Class had any reason to know or suspect Defendants' anticompetitive agreement, or any means to discover the anticompetitive conduct;

(h)    Whether Defendants fraudulently concealed the existence of their anticompetitive conduct from DPPs and members of the Class and Sub-Class;

(i)    Whether DPPs and the other members of the Class and Sub-Class were injured by Defendants' conduct and, if so, the determination of the appropriate Class-wide measure of damages; and

(j)     Whether DPPs and other members of the Class and Sub-Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

37.     *Predominance.* These and other questions of law and fact are common to the Class and Sub-Class and predominate over any questions affecting the Class members individually.

38.     *Adequacy.* DPPs will fairly and adequately represent the interests of the Class and Sub-Class because they purchased CCELL-branded Vapes directly from one or more Defendants during the Class Period and have no conflicts with any other members of the Class and Sub-Class. Furthermore, DPPs have retained sophisticated and competent counsel who are experienced in prosecuting antitrust class actions, as well as other complex litigation.

39.     *Superiority.* This class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action. Moreover, the prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VI.     FACTUAL ALLEGATIONS

### A.     The United States Vape Market

#### 1.     The Emergence of a New Market

40.     Beginning in 2012, States began to legalize cannabis[9] for recreational use. In 2012, Colorado and Washington legalized the recreational use of cannabis at the state level; Alaska, Oregon, and Washington, D.C. legalized recreational cannabis use in 2014; and California, Nevada, Massachusetts, and Maine did so in 2016. As of March 2025, recreational cannabis is legal in twenty-four (24) States and Washington D.C. In addition, medical cannabis is legal in another

---

[9]     Cannabis (marijuana) refers to "the dried leaves, flowers, stems, and seeds from the Cannabis sativa L plant. The plant contains the . . . chemical THC and other similar compounds. Extracts can also be made from the cannabis plant." *See Cannabis (Marijuana)*, NIH, https://nida.nih.gov/publications/drugfacts/cannabis-marijuana.

fifteen (15) States.

41.     The below image (**Fig. 2**) shows where cannabis is legal in the United States:[10]



*Figure 2: Marijuana Legalization in the United States*

42.     The wave of cannabis legalization led to interest in new forms of cannabis consumption. Previously, cannabis consumption methods were limited by the lack of professionalized cannabis producers investing research and development efforts into improving existing cannabis consumption methods, but after legalization, cannabis producers looked for innovative ways to improve the use of cannabis for consumers.

43.     One such emerging commercial opportunity was vaporized cannabis products. As opposed to smoked cannabis, which relies on combustion to produce smoke, vaporized cannabis aerosolizes the cannabis.

44.     The first commercially successful Vape to enter the United States market was the "O-Pen Vape" in or around 2014. However, this Vape, as well as other early entrants to this market had been initially created for nicotine rather than cannabis oils, and they therefore had the potential to produce unpleasant tastes, as well as to leak and clog, when used with cannabis oils. This is

---

[10]     Israel Sepulveda, *Marijuana Laws by State for 2025. Where is Marijuana Legal?*, COVERCANNABIS (Mar. 5, 2025), https://covercannabis.com/blog/where-is-marijuana-legal/.

because nicotine oils are stable, homogenous, and not viscous, whereas cannabis oils are unstable, heterogenous, and viscous.

### i.    CCELL's Launch

45.    Jupiter's co-founder and CEO is Mark Scatterday. Scatterday, previously a senior vice president of manufacturing and product development for NJOY, a nicotine vaporizer company, leveraged his experience to develop a new, ceramic-core Vape that was better able to handle the highly viscous cannabis oils. Scatterday had a long-standing relationship with Smoore dating to his NJOY days (Smoore having manufactured NJOY's nicotine vapes), and Scatterday decided to partner with Smoore yet again to manufacture these "new" ceramic-core Vapes.

46.    Jupiter launched its ceramic-core Vapes in the United States in or around September 2016 (indeed, the first noted commercial use of the CCELL trademark was on or around September 15, 2016) and initially held out the CCELL-brand as its own. For example, in the official guide for the 5th Annual Marijuana Business Conference & Expo—held November 16-18, 2016, in Las Vegas, Nevada—the entry for Jupiter notes: "Jupiter's CCELL™ / Reactor™ technology is a breakthrough for high viscosity extracts that improves fluid flow and performance. Please stop by our booth to learn more about the latest in vaporization hardware technology."

47.    A Chinese appellate court (the Guandong High People's Court) found that Jupiter's display and offering for sale of a CCELL-branded Vape (the so-called "Liquid 6" Vape) predated Smoore's Chinese patent application entitled "Electronic Cigarette Atomizer (TH2010)," thereby rendering Smoore's patent invalid.[11] It was also revealed in that case that Smoore had manufactured the "Liquid 6" Vape that Jupiter exhibited and sold at this November 2016 trade conference.

---

[11]    Case number (2022) 粤民终 4401 号 ((2022)YueMinZhongNo.4401).

48. Jupiter was touting its role in CCELL's creation on its X (then Twitter) account at least as late as April 2018 (**Fig. 3**).



*Figure 3: Jupiter's April 10, 2018 X Post*

49. Jupiter has sold CCELL-branded Vapes in the United States since 2016, including one or more Jupiter "exclusive" CCELL-Branded Vapes (*e.g.*, "Threaz™"). Jupiter continues to sell CCELL-branded Vapes in the United States today.

50. Jupiter is the largest CCELL-branded Vape distributor in the United States, accounting for roughly 40-50% of all CCELL-branded Vape sales in the United States.

51. Jupiter's history with Smoore and the CCELL brand gave rise to a special relationship between the two companies, including, for example, their sharing of a research and development facility in Arizona.

### ii.    The Expansion of CCELL's Distributor Network

52. Upon its introduction to the United States market, CCELL-branded Vapes rapidly grew in popularity, eventually accounting for roughly 80% of all Vapes sold in the United States. Indeed, a 2021 press release issued by 3Win noted: "In the key cannabis consumption states such as California, a shocking 77% of vape technology imports are CCELL products, 75% in Nevada, and 72% in Washington (according to Smoore 2020 research)."

53. Initially, Smoore and Jupiter were the exclusive suppliers of CCELL-branded Vapes in the United States. However, as its popularity grew, there was a need to build out the supply chain to serve more customers. This resulted in Smoore and/or Jupiter working to expand the distribution network for CCELL-branded Vapes in the United States.

54.    At roughly the same time that CCELL-branded Vapes were introduced to the public in November 2016, 3Win joined Jupiter and Smoore as an authorized distributor of CCELL-branded Vapes in the United States. Smoore and Jupiter's early partnership with 3Win made a lot of sense, as 3Win—which is located roughly fifteen (15) miles from Jupiter—already had a cozy relationship with Jupiter. This is captured in the image below, taken from 3Win's website (**Fig. 4**).



*Figure 4: 3Win Becomes an Authorized Distributor (2016)*

55.    3Win has sold CCELL-branded Vapes in the United States since at least 2016, including one or more 3Win "exclusive" CCELL-branded Vapes (*e.g.*, "The Phoenix"). 3Win continues to sell CCELL-branded Vapes in the United States today.

56.    The next Distributor Defendant to become an authorized CCELL-branded Vape distributor in the United States was CB Solutions, which did so at a yet unknown date in 2017. This is captured in the image below, taken from CB Solutions' website (**Fig. 5**).

# AUTHORIZED CCELL® DISTRIBUTOR

CB Solutions has been an Official CCELL Distributor since 2017.

*Figure 5: CB Solutions Becomes an Authorized Distributor (2017)*

57.    CB Solutions has sold CCELL-branded Vapes in the United States since at least 2017. CB Solutions continues to sell CCELL-branded Vapes in the United States today.

58.     Finally, in or around January 2018, KushCo became the fourth and final authorized CCELL-branded Vape distributor in the United States. KushCo memorialized itself as a CCELL-branded Vapes distributor in an X post on January 26, 2018, as shown in the image below (**Fig. 6**).



*Figure 6: KushCo Becomes an Authorized Distributor (2018)*

59.     KushCo has sold CCELL-branded Vapes in the United States since at least January 2018 and continued to do so at least until its acquisition by Greenlane was finalized in or around September 2021. After this point, Greenlane took over as an authorized distributor of CCELL-branded Vapes in the United States, selling CCELL-branded Vapes in the United States from at least the period beginning with its acquisition of KushCo through the present.

60.     KushCo was (and Greenlane is) the second largest CCELL-branded Vape distributor in the United States, accounting for no less than 25-30% of all CCELL-branded Vape sales in the United States.

61.     Thus, by no later than February 1, 2018, each of the Distributor Defendants (or its predecessor in interest) had signed a Distribution Agreement with Smoore, authorizing them to sell CCELL-branded Vapes in the United States. This has been the status quo since.

62.     Collectively, Defendants have sold tens of millions of CCELL-branded Vapes to members of the putative Class and Sub-Class during the Class Period.

### 2.     The Vape Supply Chain in the United States

63.     While each State's cannabis market is localized to within its borders, the wholesale market for unfilled Vapes is nationwide, as Vapes ***not*** containing cannabis—such as the CCELL-branded Vapes sold by Defendants to DPPs and members of the putative Class and Sub-Class—can be (and are) shipped nationwide.

64.     Generally speaking, the supply chain for Vapes in the United States has three levels

between manufacturers and consumers.

(a) Manufacturing: Vape manufacturers, either located overseas or in the United States, manufacture the Vapes.

(b) Wholesale Distribution: Vape manufacturers sell their Vapes into the United States in bulk, either directly or through authorized distributors, to DPPs and members of the putative Class and Sub-Class.

(c) Retail Distribution: DPPs and members of the putative Class and Sub-Class then fill the empty Vapes with oils or extracts and sell them to licensed retail shops (or if vertically integrated, directly to consumers).

(d) Consumer Sales: Consumers purchase the filled Vapes.

65. The dominant manufacturer of Vapes sold in the United States is Smoore, and the dominant distributors of Vapes sold in the United States are the Distributor Defendants.

66. Both Smoore and Jupiter have admitted that Smoore competes with the Distributor Defendants at the wholesale distribution level (*i.e.*, the level at which DPPs and members of the putative Class and Sub-Class purchased CCELL-branded Vapes):

(a) Smoore admitted in its Answer to another Vape manufacturer's antitrust counterclaims, "that it sells cannabis vaporizer hardware through distributors and, to a lesser extent, directly to some cannabis oil producers," and that "it sells a portion of its products directly to cannabis oil producers."[12]

(b) Jupiter's parent company, Tilt Holdings Inc., admitted in a recent Form 10-K filing that its "business competes primarily with distributors of CCELL® vape hardware, and with CCELL's direct sales team, in the U.S. and Canada."

67. The fact that Smoore is a horizontal competitor with the Distributor Defendants was similarly confirmed by the International Trade Commission ("ITC") following an extensive review

---

[12] Smoore Answer ¶¶ 59 & 63.

of evidence submitted by, among others, Smoore, Jupiter, and Greenlane. Specifically, the ITC found that "[i]n many instances, a distribution partner such as Greenlane or Jupiter is skipped entirely because the CCELL-branded products are drop-shipped from Smoore in China directly to customers in the United States."[13]

68.    As a result, Defendants' Vape supply chain in the United States looks something like the below graphic (**Fig. 7**):



*Figure 7: Defendants' United States Vape Supply Chain*

69.    Notwithstanding their status as horizontal competitors, Defendants have entered into a *per se* illegal price-fixing and market allocation agreement, as detailed below.

### 3.    *Vapes Available in the United States Today*

70.    Vapes are comprised of multiple parts—typically a mouthpiece, a cartridge, a tank/reservoir, a heating element, and a battery—that are sold either in their assembled form, or in their component parts.

71.    The most common Vape is the industry-standard "510 threaded cartridge,"[14] which accounts for the vast majority of Vape sales in the United States. Other Vapes sold in the United States include "Pod Systems," and "All-in-Ones" (or "AIOs").

---

[13]    ITC Decision at 97.

[14]    The "510 threaded" refers to the ten threads, each measuring 5mm. *See* Hemok Wang, *What Is the 510 Thread, and How Does It Work?*, Innokin, https://www.innokin.com/blog/what-is-the-510-thread-and-how-does-it-work.

72.    The below images show (a) the complete assembly for a "510-threaded" Vape on the left and its separate components (excluding the battery) on the right (**Fig. 8**), (b) the complete assembly for a "Pod System" Vape on the left and its components on the right (**Fig. 9**), and (c) examples of AIO Vapes (**Fig. 10**):



*Figure 8: 510-Threaded Vape Assembly*



*Figure 9: Pod System Vape Assemblies*



*Figure 10: All-In-One Vapes*

73.    Defendants sell each of these Vape styles under the CCELL-brand in the United States directly to members of the putative Class and Sub-Class.

**B.    Defendants' Unlawful Horizontal Agreement**

74.    As set forth above, Smoore has been a horizontal competitor with the Distributor Defendants in the wholesale distribution of CCELL-branded Vapes sold in the United States throughout the Class Period.

75.    No Defendant is a parent, subsidiary, or affiliate of any other Defendant, and no Defendant has entered into a joint venture with another Defendant with regard to the sale of Vapes. Consequently, each Defendant would, absent the alleged anticompetitive agreement, be a competitor with one another in the sale of Vapes in the United States.

76.    As described in greater detail below, Defendants' horizontal agreement was formed by no later than December 1, 2016 (initially as an agreement between Smoore, Jupiter, and 3Win), and expanded to include CB Solutions (by no later than 2017) and Kush/Greenlane (by no later than 2018). Each Defendant knowingly joined the conspiracy, and Defendants' joint implementation and enforcement have ensured that it has remained in place through the present.

### i.    Adoption

77.    On information and belief, Smoore, Jupiter, and 3Win all agreed not to compete with one another in the wholesale distribution of CCELL-branded Vapes beginning on or shortly after the product was introduced to the United States in November 2016. Indeed, Jupiter and 3Win—practical next-door neighbors with a long, cozy relationship—have both trumpeted their 2016 involvement with CCELL-branded Vapes.

78.    As the popularity of CCELL-branded Vapes began to explode, however, Defendants Smoore, Jupiter, and/or 3Win began working to identify other distributors who would also be willing to abide by their already-reached anticompetitive agreement.

79.    Specifically, Jupiter and/or 3Win, with their greater familiarity of the US market, assisted Smoore in these efforts. As noted above, CB Solutions followed as the third authorized distributor by no later than 2017, and KushCo followed by no later than 2018, becoming the fourth and final authorized distributor of CCELL-branded Vapes in the United States. Thus, all members of the anticompetitive agreement had joined the illegal enterprise by no later than January 2018.

80. The existing parties to the anticompetitive agreement conditioned the ability of others to become additional authorized CCELL-branded Vapes distributors in the United States on, among other things:

(a) Signing a Distribution Agreement that contained (or incorporated by reference) a wholesale price floor on CCELL-branded Vapes; and

(b) Agreeing not to compete with the other Defendants for some or all of their CCELL-branded Vape customers.

81. Vape distributors that were unwilling to agree to these terms were not permitted to become authorized distributors of CCELL-branded Vapes in the United States.

82. As to the first requirement, Smoore has admitted that "some" of its Distribution Agreements contain (what it refers to as) "price guidelines."[15]

83. As to the second requirement, the Distributor Defendants were prohibited from competing for at least some customers of other Defendants, and customers seeking to make a switch were required to request permission, in writing, from Smoore before being permitted to make the switch.

84. Each Defendant agreed to the terms of the anticompetitive agreement knowing that the other Defendants had similarly agreed to the terms of the anticompetitive agreement.

### ii.    Implementation

85. Defendants implemented their anticompetitive scheme through trainings (at least some of which were created by Smoore) and joint, in-person meetings involving employees from each of the Defendants.

86. As to the former, Defendants trained their employees to abide by the agreed-upon minimum wholesale prices and to not compete for each others' customers. Indeed, Smoore has admitted that "it produced and provided instructional training materials to its distributors . . . ."[16] Moreover, Smoore has admitted that "it communicated with its distributors regarding compliance

---

[15] Smoore Answer ¶ 62.
[16] Smoore Answer ¶ 73

with the terms of its distributor agreements . . . ."[17]

87.    As to the latter, Smoore and the Distributor Defendants have held one or more in-person meetings in the United States where they, among other things, confirmed some or all of the terms of their anticompetitive agreement.

88.    Indeed, Smoore and the Distributor Defendants held (an) in-person meeting(s) in Los Angeles in 2018 and/or 2019, where they confirmed that Defendants had agreed not to compete with one another.

89.    Participants to at least one of these in-person meetings included high-ranking executives from each of the Defendants. While DPPs have not yet been able to identify every attendee, the below individuals attended at least one of these in-person meetings:

(a)    Smoore: Joe Strain (VP of CCELL) and Shallyn Lin (Head of North American Sales);[18]

(b)    Jupiter: Mark Scatterday (CEO), Joseph Barberio (COO), and Paul Stremcha (Head of Sales);

(c)    3Win: Chris Sinacori (CEO) and Eric Newman (Chief Sales Officer);

(d)    KushCo: Nick Kovacevich (CEO),[19] Jim McCormick (CFO), Jason Manasse (VP of Business development), and Jason Vegotsky (President/VP of Sales); and

(e)    CB Solutions: Danny Allen (CEO).

90.    The Defendants' executives were greeted at one such in-person meeting in Los Angeles that occurred in 2018 with a large banner displaying each of their logos and the words: "Friendship"; "Understanding"; and "Joint Success."

91.    Pictures of Defendants' executives at that gathering are below (**Figs. 11-15**; *see also* **Fig. 1**, *supra*):

---

[17]    Smoore Answer ¶ 72.
[18]    Smoore's Shallyn Lin is based in California.
[19]    Nick Kovacevich became Smoore's Corporate Relations Director in May 2024.



*Figure 11: All Defendant In-Person Meeting*
*(Presentation by KushCo CEO, Nick Kovacevich, to All Defendants)*



*Figure 12: All Defendant In-Person Meeting*
*(Presentation by Jupiter COO, Joseph Barberio, to All Defendants)*



*Figure 13: All Defendant In-Person Meeting*
*(Presentation by Unknown Smoore Employee to All Defendants)*



*Figure 14: All Defendant In-Person Meeting*
*(CB Solution CEO, Danny Allen, with Smoore's Head of North*
*American Sales, Shallyn Lin, and Others)*



*Figure 15: All Defendant In-Person Meeting*
*(Presentation by 3Win CEO, Chris Sinacori, to All Defendants)*

### iii.    **Monitoring and Enforcement**

92.    Defendants monitored and enforced their anticompetitive agreement in at least three ways:

   (a)    the Distributor Defendants' monthly sharing of confidential customer names and price information with Smoore;

   (b)    the Distributor Defendants' reporting of potential violations to Smoore, which Smoore investigated and attempted to correct (including by

contacting the alleged violator); and

(c)     Smoore's threat of deducting money from the Distributor Defendants' security deposit paid by them to Smoore.

93.     As to the first (sharing of competitively sensitive information), Smoore has admitted that "some of its distributor agreements require the distributor to report its customer lists on a monthly basis."[20]

94.     As to the second (complaining of violations), the Distributor Defendants would report other Defendants' attempts to price below the agreed-upon wholesale price floor or take another Defendant's customer(s) to management, who would then communicate the issue to Smoore for resolution. Smoore would then render a judgment on the alleged violation, including a determination on how it was to be resolved. Smoore's decision would be communicated back to the Distributor Defendants.

95.     As to the third (security deposit penalties), Smoore has admitted that "some of its distributor agreements include price guidelines and security deposit provisions."[21]

96.     These monitoring and enforcement mechanisms ensured that no Defendant could, at least for an extended period of time, cheat on each other by, for example, charging lower prices or selling to another Defendant's customers.

### C.     Defendants' Agreement Had Actual Anticompetitive Effects

97.     Defendants' anticompetitive agreement has increased prices and reduced output.

98.     As to prices, Defendants' scheme allowed them to maintain prices at or above agreed upon wholesale price floors which were higher than Defendants would have charged absent Defendants' agreement.

99.     As to output, Defendants' scheme reduced the number of CCELL-Branded Vapes sold at the wholesale level.

100.     This is not merely conjecture. Since roughly the time that a potential Vape

---

[20]     Smoore Answer ¶ 69.
[21]     Smoore Answer ¶ 66.

competitor lodged antitrust counterclaims against Smoore—which are largely similar to those presented here, and which were found to be sufficient to survive a motion to dismiss by the United State District Court for the Central District of California—inter-competitor competition has increased and pricing for CCELL-branded Vapes has fallen.

### D.   Defendants' Other Exclusionary Conduct

101.   Smoore furthered the anticompetitive restraints alleged herein by engaging in other exclusionary conduct, including, for example, pursuing objectively baseless litigation before the ITC against dozens of would-be competitors.

102.   Specifically, in 2021, Smoore filed its ITC Complaint, alleging infringement of three U.S. Patents related to oil-vaping cartridges, including U.S. Patent Nos. 10,791,762 (the "'762 Patent"), 10,791,763 (the "'763 Patent"), and 10,357,623 (the "'623 Patent"). Smoore's complaint listed thirty-eight (38) proposed respondents, which was all or virtually all of Defendants' would-be Vape competitors in the United States.

103.   The ITC instituted an investigation, *Certain Oil-Vaping Cartridges, Components Thereof, and Products Containing the Same*, Inv. No. 337-TA-1286 (the "ITC Investigation"), by publication of a notice in the Federal Register (86 Fed. Reg. 62567-69) on November 10, 2021.

104.   In February 2022, ITC Chief Administrative Law Judge Clark S. Cheney issued an Initial Determination. In relevant part, Judge Cheney concluded as follows:[22]

> (a)   Claims 1, 2, 3, 5, and 6 of the '623 Patent had ***not*** been infringed by the respondents and were invalid as indefinite;
>
> (b)   Claims 1, 2, and 7 of the '762 Patent had ***not*** been infringed by the respondents;
>
> (c)   Claims 1 and 11 of the '763 Patent had ***not*** been infringed by the respondents;
>
> (d)   Smoore had failed to satisfy both the technical and economic prongs of the

---

[22]   ITC Decision at 4-15.

domestic injury requirement with respect to all three patents; and

(e)    The '623 Patent was "unenforceable due to inequitable conduct."

105.    As to the respondents' non-infringement of the '623 Patent, '762 Patent, and '763 Patent, Judge Cheney found that Smoore had failed to supply sufficient evidence to prove that the respondents' Vapes infringed on its patents, faulting Smoore for not providing the ITC with "meaningful analysis or discussion" and instead resting its case on "only conclusory allegations of infringement followed by lengthy string citations (often more than ten lines long) that fail to connect individual product features to the claim limitations."[23]

106.    As to the unenforceability of the '623 Patent, Judge Cheney found that Smoore had fraudulently obtained this patent.[24] Specifically, Judge Cheney found as follows:[25]

(a)    Smoore employee Wenjian Qi arranged for his wife's company, Shenzhen Detail Technology Company, Ltd., to purchase an abandoned patent application (for the '553 patent);

(b)    Mr. Qi subsequently worked with California-based patent prosecutor Andrew Cheng to revive abandoned '553 patent;

(c)    Mr. Cheng "knowingly submitted a false declaration about the reason the '553 application was abandoned";

(d)    "The '623 patent issued from continuations of the revived '553 application and was ultimately sold to Smoore";

(e)    "The evidence demonstrates clearly and convincingly that Mr. Cheng knowingly filed a false declaration with the Patent Office and that the false declaration was material to the grant of patent rights maturing from the '553 application";

(f)    "[T]he '623 patent is unenforceable due to inequitable conduct"; and

---

[23]    ITC Decision at 55-60.

[24]    This finding is proof that the ITC Action "objective baseless" from the outset. *See Hydranautics v. FilmTec Corp.*, 70 F.3d 533, 538 (9th Cir. 1995).

[25]    ITC Decision at 90-94.

(g)    "[T]here can be no finding of violation of section 337 based on allegations of infringement of the '623 patent."

107.    Smoore's prosecution of these three patents before the ITC, including of one that was fraudulently obtained, largely achieved Smoore's true intent in filing the suit: stopping legal competition from these would-be competitors.

108.    Specifically, during the course of the ITC investigation, thirteen (13) respondents were terminated based on consent orders; six (6) respondents were terminated due to settlements with Smoore; two (2) respondents were terminated based on Smoore's withdrawal of its allegations in the complaint; and six (6) respondents were found in default. This is shown below (**Table 1**):

*Table 1: Status of ITC Respondents*

| No. | ITC Respondent | Address (From ITC Complaint) | Source |
|-----|----------------|------------------------------|--------|
| **Consent Orders** | | | |
| 1 | headcandysmokeshop.com | 200-2288 No. 5 Road Richmond, BCV6X 2T1 Canada | *See* Order No. 9 (Dec. 16, 2021) |
| 2 | Head Candy Enterprise Ltd. | 121-618 East Kent Ave. South Vancouver, BC V5X 0B1, Canada | |
| 3 | ZTCSMOKE USA Inc. | 599B West John Sims Pkwy Niceville, FL 35278 | *See* Order No. 10 (Dec. 20, 2021) |
| 4 | dcalchemy.com | 10645 N. Tatum Blvd. Suite 200 Phoenix, AZ 85028 | *See* Order Nos. 12 and 13 (Dec. 21, 2021) |
| 5 | DC Alchemy, LLC | | |
| 6 | Royalsupplywholesale.com | 5432 Geary Blvd. Suite 321 San Francisco, CA 94121 | |
| 7 | Customcanabisbranding.com | | |
| 8 | CLK Global, Inc. | | |
| 9 | Ygreeninc.com | 671 Brea Canyon Road Suite 2 Walnut, CA 91789 | *See* Order No. 15 (Jan. 10, 2022) |
| 10 | Ygreen Inc. | | |

| 11 | Cannary Packaging Inc. | 9-1415 Hunter Court<br>Kelowna, BC, V1X 6E6, Canada | *See* Order Nos. 16 and 17 (Jan. 18, 2022) |
|----|----|----|----|
| 12 | Cannary LA | 2901 Gardena Avenue<br>Signal Hill, CA 90755 | |
| 13 | The Calico Group Inc. | 2801 Via Fortuna<br>Suite 675<br>Austin, TX 78746 | *See* Order No. 46 (Jan. 31, 2023) |
| **Settlements** | | | |
| 1 | shopbvv.com | 1251 Frontenac Road, Suite 150<br>Naperville, IL 60563 | *See* Order No. 29 (June 7, 2022) |
| 2 | Best Value Vacs, LLC | | |
| 3 | Jonathan Ray Carfield d/b/a AlderEgo Wholesale, AlderEgo Holdings, Inc. and AlderEgo Group Limited a/k/a AVID Holdings Limited | Apt. 2702, Unit 1, Block A<br>Tianyuan Building 5, Gangxia Center<br>Futian District, Shenzhen 518016<br>Guangdong, China | *See* Order Nos. 33 and 34 |
| 4 | Hanna Carfield | PO Box 7010<br>Tacoma, Washington 98417 | |
| 5 | Atmos Nation LLC | 4800 SW 51st Street, Suite 106<br>Davie, FL 33314 | |
| 6 | AlderEgo Group Limited | Room 21, Unit A, 11F<br>Tin Wui Industrial Building<br>No. 3 Hing Wong Street<br>Tuen Mun, N.T., Hong Kong | |
| **Complaint Withdrawn** | | | |
| 1 | International Vapor Group, LLC | 14300 Commerce Way<br>Miami Lakes, FL 33016 | *See* Order No. 17 (Jan. 21, 2022) |
| 2 | BBTank USA, LLC | 213 Secor Road #583<br>Lambertville, MI 48144 | *See* Order No. 20 (Feb. 23, 2022) |
| **Default** | | | |
| 1 | Glo Extracts | 6230 Wilshire Blvd.<br>Los Angeles, CA 90048 | *See* Notice by the ITC (July 19, 2023) |
| 2 | BulkCarts.com | 42010 Koppernick Road<br>Suite 114<br>Canton, MI 48187 | *See* Order No. 42 (Jan. 23, 2023) |
| 3 | Greenwave Naturals LLC | 11800 Silkwood Cove<br>Austin, TX 78739 | |
| 4 | Cartridgesforsale.com | P.O. Box 971024<br>Ypsilanti, MI 48197 | |

DPPS' CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT

28

CASE No. 25-MD-3161

| 5 | HW Supply, LLC | 324 Airport Industrial Dr. Ypsilanti, MI, 48198 | |
| 6 | Obsidian Supply, Inc. | 16 Technology Dr. #103 Irvine, CA 92618 | |
| **No Violation Found** | | | |
| 1 | Bold Crafts, LLC d/b/a Bold Carts and BoldCarts.com | 420 Goddard Ave. Irvine, CA 92618 | |
| 2 | The Blinc Group Inc. | 40 Fulton Street 6 Floor New York, NY 10038 | |
| 3 | Next Level Ventures, LLC | 3131 Western Ave. Suite 325 Seattle, WA 98121 | |
| 4 | Advanced Vapor Devices, LLC | 1230 Long Beach Ave. Los Angeles, CA 90021 | |
| 5 | avd710.com | 3131 Western Ave Suite 325 Seattle, WA 98121 | *See* ITC Decision |
| 6 | A&A Global Imports, Inc. d/b/a Marijuana Packaging | 3359 East 50th Street Vernon, CA 90058 | |
| 7 | Bulk Natural, LLC d/b/a True Terpenes | 524 E Burnside Street Suite 600 Portland, OR 97214 | |
| 8 | Brand King, LLC | 717 Del Paso Road Sacramento, CA 95834 | |
| 9 | Greentank Technologies Corp. | 102-135 Liberty Street Toronto, ON, M6K 1A7, Canada | |
| 10 | iKrusher.com | 11818 Clark Street Arcadia, CA 91006 | |

109.    At least some of the respondents who resolved the ITC action by consent decree or settlement appear to have agreed to stop competing with Defendants as a condition of being dropped from the ITC action.

110.    Undeterred by the ITC's conclusion that the respondents did not infringe on these three patents, Smoore has filed lawsuits against some or all of the would-be competitors who it did not force out of competition through the ITC suit based on some or all of the very same patents

that the ITC concluded had not been infringed by these potential competitors.[26]

**E.    The Structure and Characteristics of the Wholesale Distribution of Vapes in the United States**

111.    The structure and other characteristics of the wholesale market for unfilled Vapes in the United States make it conducive to anticompetitive conduct among Defendants and make collusion particularly attractive.

*1.    The Wholesale Market for Unfilled Vapes in the United States is Highly Concentrated, with Defendant Smoore Being the Dominant Manufacturer and the Distributor Defendants Being the Dominant Distributors.*

112.    The presence of a small group of major sellers is one of the conditions that the U.S. Department of Justice ("DOJ") has identified as being favorable to collusion. Put differently, a highly concentrated market is more susceptible to collusion and other anticompetitive practices than a less concentrated market.

113.    Smoore is the dominant manufacturer of unfilled Vapes sold in the United States, and Distributor Defendants are the dominant wholesale distributors of unfilled Vapes sold in the United States.

114.    Specifically, throughout the Class Period, Smoore has manufactured between roughly 70% and 80% of all unfilled Vapes sold at the wholesale level in the United States. That is, CCELL-branded Vapes have accounted for between roughly 70% and 80% of all unfilled Vapes sold in the United States during the Class Period.

115.    Defendants are the exclusive wholesale suppliers of CCELL-branded Vapes in the United States.

116.    Thus, the relevant market (wholesale sales of Vapes in the United States) is highly concentrated, and Defendants collectively controlled a dominant share of this market throughout the Class Period.

---

[26]    *See*, *e.g.*, *Shenzhen Smoore Tech. Co., Ltd. v. Next Level Ventures, LLC & Advanced Vapor Devices, LLC*, Case No. 2:22-cv-7646 (C.D. Cal. Oct. 19, 2022); *Shenzhen Smoore Tech. Co., Ltd. v. A&A Global Imports, Inc.*, Case No. 2:22-cv-8014 (C.D. Cal. Nov. 2, 2022); *Shenzhen Smoore Tech. Co., Ltd. v. Greentank Tech. Corp.*, Case No. 2:22-cv-7638 (C.D. Cal. Oct. 19, 2022); *Shenzhen Smoore Tech. Co., Ltd. v. The Calico Group Inc.*, Case No. 2:22-cv-7633 (C.D. Cal. Oct. 19, 2022).

117.    Indeed, Smoore claims that its CCELL-branded Vapes are "a technology brand and global innovator in the portable vaporizer space that revolutionized the industry by introducing the ceramic heating component," and that CCELL-branded Vapes have become one of the world's largest vaporizer suppliers.

### 2.    Barriers to Entry are High

118.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market. Such high barriers to entry exist here.

119.    The development and manufacture of Vapes requires lengthy research and development, as well as expensive equipment and facilities.

120.    In addition, the distribution of Vapes to customers is also expensive inasmuch as it requires costly sales and distribution infrastructure, including a network of salespeople and physical infrastructure such as warehouses to hold inventory. What is more, there are also inventory carrying costs to be taken into account.

121.    Finally, sales of Vapes are driven, in large part, by personal relationships, further making it difficult for new entrants to gain share.

122.    Defendants' agreement to only sell CCELL-branded Vapes further elevated these already high barriers to entry.

123.    In addition, Smoore's scheme—backed by some or all of the Distributor Defendants—to pursue ITC litigation against would-be competitors acted as a further barrier to entry. Indeed, as set forth above, the ITC Complaint had the effect of removing numerous potential competitors from the market.

124.    The high barriers to entry make it unlikely that supra-competitive prices would result in new competitors entering the market.

125.    The high barriers to entry also made it unlikely that potential Vape competitors could increase their output in the short run.

126. These high barriers to entry also make the market more susceptible to collusion.

### 3. Demand for Vapes is Inelastic

127. "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchase substitute products or decline to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering product substitution and lost sales revenue.

128. Industries with inelastic demand are thus more susceptible to cartel behavior because of the potential for large increases in revenue resulting from the higher cartel prices.

129. Demand for Vapes by DPPs and members of the putative Class and Sub-Class is inelastic within the pricing ranges observed for this product in the United States during the Class Period. Because the cost of Vapes is small relative to the overall cost of Vapes filled with cannabis oil, small but significant supra competitive prices have been imposed on DPPs and members of the putative Class and Sub-Class by Defendants without an offsetting loss in sales.

### 4. There Were Numerous Opportunities for Defendants to Collude

130. The DOJ notes that competitors who "know each other well through social connections, trade associations, [and] legitimate business contacts" are more likely to collude.

131. First, and as set forth above, Defendants met in-person to implement their illegal scheme.

132. Second, the contractual relationships established among Defendants provided a direct and structured opportunity for collusion. As stipulated in the Distribution Agreements, the requirement for the Distributor Defendants to provide one another with monthly reports on customer activity and pricing not only allowed Defendants to monitor compliance but also provided an ongoing opportunity to communicate and collude. Indeed, these reports and communications facilitated the exchange of sensitive market information and ensured that all parties remained aligned in their goal of restraining competition.

133.    Third, Defendants attended many of the same industry events and trade shows in the United States, including CannaCon, MJBizCon, and CHAMPS Trade Shows.

**F.    Interstate Trade and Commerce**

134.    Defendants sell Vapes in the United States in a continuous and uninterrupted flow of interstate commerce, including in this District.

135.    Defendants' business substantially affects interstate commerce in the United States and affects a substantial volume of trade and commerce in various states in the United States.

136.    Defendants' businesses substantially affect interstate commerce and have caused antitrust injury to DPPs and members of the putative Class and Sub-Class.

**VII.    TOLLING OF THE STATUTES OF LIMITATIONS**

**A.    DPPs Could Not Have Discovered Their Injury Within Four Years of Filing this Complaint**

137.    DPPs and members of the putative Class and Sub-Class had neither actual nor constructive knowledge, and no reason to believe, that they paid prices for CCELL-branded Vapes that were affected by Defendants' illegal conduct in the four years prior to their initiating the present litigation.

138.    By its very nature, the alleged misconduct of Defendants was self-concealing. The Distribution Agreements, internal communications, and monitoring and enforcement mechanisms between Defendants were not public information, rendering impossible any ascertainment of their specific misconduct.

**B.    In the Alternative, Defendants Fraudulently Concealed their Anticompetitive Agreement**

139.    Defendants fraudulently concealed their scheme by not disclosing their anticompetitive agreement.

140.    The Ninth Circuit has held that "[a] statute of limitations may be tolled if the defendant fraudulently concealed the existence of a cause of action in such a way that the plaintiff, acting as a reasonable person, did not know of its existence." *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012). Invocation of this doctrine requires some affirmatively

misleading act by the antitrust defendant. *See In re Coordinated Pretrial Proc. in Petroleum Prod. Antitrust Litig.*, 782 F. Supp. 487, 489 (C.D. Cal. 1991).

141. In the June 29, 2020 Global Offering memorandum—Smoore's parent inaccurately represented that Smoore's distributors had autonomy over their pricing decisions:

> We generally sell our products to distributors at around 34% to 43% of the retail price *recommended* by us. The prices at which we sell our products to the distributors are determined on a cost-plus basis. We will offer different levels of discounts to distributors based on their distributorship types and sales network coverage on a case-by-case basis. We *provide guidance regarding price range* as well as product promotional discount policies and programs to our distributors according to their tier. Our *distributors should follow our guidance and formulate the final selling price based on their operational performance*.

142. This assertion was false and materially misleading because the true facts were that Defendants agreed that pricing to DPPs and members of the putative Class and Sub-Class were set by agreement rather than unilaterally.

143. In addition, Defendants fraudulently concealed their anticompetitive agreement by offering pretextual explanations for the pricing of their Vapes. For example, Smoore has claimed that CCELL-branded Vapes are more expensive than competitors' Vapes because they are better products, and Defendant 3Win claims on its website that CCELL-branded Vapes are expensive because they "are of the highest standard and quality in the industry." These public-facing explanations for the higher prices for CCELL-branded Vapes fraudulently concealed the true reason they were more expensive: Defendants' anticompetitive conduct.

144. Moreover, Defendants communicated secretly, including by email, to avoid public disclosure of their anticompetitive conduct.

**C.      In the Alternative, the Continuing Violation Doctrine Applies**

145. In the alternative, DPPs and members of the putative Class and Sub-Class are entitled to at least four years of damages from the filing of the *Earth's Healing* litigation. *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (2014) ("Turning first to the continuing violation exception, the Supreme Court and federal appellate courts have recognized that each time a defendant sells its

price-fixed product, the sale constitutes a new overt act causing injury to the purchaser and the statute of limitations runs from the date of the act.").

## VIII.  RELEVANT MARKET

146.    Because DPPs are alleging a *per se* violation of the Sherman Act and Cartwright Act, they need not allege a relevant market for antitrust purposes. *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 100 (1984) (noting that *per se* restraints are "presumed unreasonable without inquiry into the particular market context in which it is found"); *see also Marsh v. Anesthesia Servs. Med. Grp., Inc.*, 200 Cal. App. 4th 480, 493 (2011); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 986 (9th Cir. 2000).

147.    Moreover, DPPs need not allege a relevant market for antitrust purposes where, as here, evidence has been proffered that the restraint actually resulted in anticompetitive effects, such as increased prices or decreased output. *See FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 461 (1986) ("[T]he finding of actual, sustained adverse effects on competition . . . is legally sufficient to support a finding that the challenged restraint was unreasonable even in the absence of elaborate market analysis.").

148.    However, because DPPs are alleging illegal vertical agreements in the alternative, DPPs allege the relevant market for antitrust purposes below.

149.    As set forth in greater detail below, the relevant market for antitrust purposes is the wholesale market for unfilled Vapes in the United States, and Defendants have market power in this relevant market.

### A.    Relevant Product Market

150.    The relevant product market is the wholesale market for unfilled Vapes and generally consists of a mouthpiece, a reservoir, atomizer assembly, and battery, whether sold as an assembled unit or as disassembled component parts.

151.    End users (*i.e.*, consumers) recognize that Vapes offer significant advantages over other cannabis-delivery systems.

152.    Vapes are sold to different customers (*i.e.*, DPPs and members of the putative Class

and Sub-Class) than other cannabis delivery systems, and manufacturers of Vapes do not typically compete with manufacturers of other cannabis delivery systems.

153. Because of, *inter alia*, the differences between different cannabis delivery systems, Vapes are highly specialized products utilized by a core group of customers (*i.e.*, DPPs and members of the putative Class and Sub-Class) and consumers whose preferences are strong enough to constitute an independent antitrust market.

154. As such, Vapes do not exhibit strong, positive cross-elasticity of demand with respect to the price of other cannabis delivery systems. Thus, if a hypothetical monopolist were to impose a small but significant non-transitory increase in the price of Vapes, customers (*i.e.*, DPPs and members of the putative Class and Sub-Class) and consumers could not switch to alternative products and thereby render the price unprofitable, because no other product would result in a cannabis consumption product with the required characteristics discussed above.

155. Notably, Judge Birotte Jr. in the United States District Court for the Central District of California held that allegations similar to the above were sufficient to plead the wholesale market for unfilled Vapes was a relevant product market for antitrust purposes at the pleading stage.[27]

**B.    Relevant Geographic Market**

156. The relevant geographic market is the United States.

157. While cannabis is only legal, either for recreational or medicinal use, in thirty-nine (39) states, *see* Fig. 2, *supra*, the wholesale market for unfilled Vapes is nationwide as there are no legal impediments to shipping unfilled Vapes throughout the United States.

158. Moreover, the Distributor Defendants are permitted to sell unfilled Vapes only in the United States, and Smoore has entered into agreements with different authorized wholesale distributors for Canada (*e.g.*, Calyx Labs) and Europe (*e.g.*, Signature Products GmbH).

**C.    Defendants' Market Power**

159. The United States Court of Appeals for the Ninth Circuit has held that market power can be shown in two different ways.

---

[27]    *See* NLV Mot. to Dismiss Order at 8-9.

160. First, market power can be shown by "direct evidence of the injurious exercise of market power" such as "evidence of restricted output and supracompetitive prices, that is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (citing *FTC v. Indiana Fed'n of Dentists,* 476 U.S. at 460-61).

161. In the alternative, market power can be shown with evidence "that the defendant owns a dominant share" of the relevant market, "that there are significant barriers to entry," and "that existing competitors lack the capacity to increase their output in the short run." *Id*. (citing cases).

162. Defendants have market power under either standard.

163. As to the former, Defendants had (and exercised) their ability to increase prices and reduce output in the wholesale market for unfilled Vapes throughout the Class Period.

164. As to the latter and throughout the Class Period, Defendants have had a dominant share in the wholesale market for unfilled Vapes, there are significant barriers to entry to that market, and Defendants' competitors lack the ability to increase their output in that market in the short run.

## IX.   CLAIMS FOR RELIEF

### COUNT ONE
**Horizontal Restraint of Trade in Violation of Section 1 of the Sherman Act
(15 U.S.C. §§ 1, 3)
(On Behalf of All DPPs and the Class and California Sub-Class)**

165. DPPs hereby repeat and incorporate by reference each preceding paragraph as though fully set forth herein.

166. DPPs bring this claim on behalf of themselves and members of the putative Class and Sub-Class.

167. Each Defendant sells CCELL-branded Vapes to DPPs and members of the putative Class and Sub-Class at the wholesale level. That is, Defendants are horizontal competitors with one another in the wholesale market for unfilled Vapes in the United States.

168. Moreover, Smoore organized, facilitated, and enforced a horizontal agreement between the Distributor Defendants—the dominant wholesale distributors of Vapes in the United States.

169. Therefore, Defendants' agreement to set a wholesale price floor for CCELL-branded Vapes sold in the United States and not compete for some or all of each others' customers is a horizontal agreement in restraint of trade that was entered into for the purpose of combining and conspiring to raise, fix, maintain, or stabilize the wholesale prices of CCELL-branded Vapes sold to DPPs and members of the Class and Sub-Class during the Class Period.

170. Because this Consolidated Class Action Complaint presents allegations of violations of the federal antitrust laws that are illegal *per se*, no allegations with respect to the relevant product market, geographic market, or market power are required.

171. However, to the extent a relevant market is required for this claim, the relevant market for antitrust purposes is the wholesale market for unfilled Vapes in the United States, and Defendants collectively exercise market power in the relevant market.

172. Beginning some time before but no later than December 1, 2016, the exact date being unknown to DPPs and exclusively within the knowledge of Defendants, Defendants entered into a continuing horizontal contract, combination, and conspiracy to unreasonably restrain trade and commerce in violation the Sherman Act (15 U.S.C. §§ 1, 3) by artificially reducing or eliminating competition for CCELL-branded Vapes sold directly to DPPs and members of the putative Class and Sub-Class.

173. Defendants' anticompetitive and unlawful conduct has directly and proximately caused injury to DPPs and members of the putative Class and Sub-Class by restraining competition and raising, maintaining, and/or stabilizing the wholesale price of CCELL-branded Vapes at levels above what would have occurred if competition had prevailed.

174. As a direct and proximate result of Defendants' conduct, DPPs and members of the putative Class and Sub-Class were damaged—they paid more for CCELL-branded Vapes than they would have absent Defendants' anticompetitive conduct—in an amount to be proven at trial, and

DPPs accordingly seek treble damages, costs, and reasonable attorney's fees pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

175.    In addition, Defendants' anticompetitive conduct should be permanently enjoined.

### COUNT TWO
**Vertical Restraints of Trade in Violation of Section 1 of the Sherman Act**
**Brought in the Alternative**
**(15 U.S.C. §§ 1, 3)**
**(On Behalf of All DPPs and the Class and California Sub-Class)**

176.    DPPs hereby repeat and incorporate by reference each preceding paragraph as though fully set forth herein.

177.    DPPs bring this claim on behalf of themselves and members of the putative Class and Sub-Class and as an alternative to DPPs' Claim One.

178.    Defendants engaged in vertical restraints of trade in violation of the antitrust laws.

179.    Specifically, Defendant Smoore entered into agreements with each of the Distributor Defendants whereby they agreed to set a wholesale price floor for CCELL-branded Vapes sold in the United States and to not compete for some or all of each others' customers.

180.    The relevant market for antitrust purposes is the wholesale market for unfilled Vapes in the United States.

181.    Defendants collectively exercise market power in the relevant market.

182.    Smoore's vertical agreements with each of the Distributor Defendants—whether encompassed in the Distribution Agreements or otherwise—adversely impacted intrabrand competition in the relevant market by, *inter alia*, setting a minimum wholesale price for CCELL-branded Vapes and barring Defendants from competing for some or all of each others' customers.

183.    Smoore's vertical agreements with each of the Distributor Defendants adversely impacted interbrand competition in the relevant market by, *inter alia*, barring Defendants from selling non-CCELL-branded Vapes in the relevant market.

184.    There is no procompetitive justification for Smoore's vertical agreements with each of the Distributor Defendants, and even if even if there were, the anticompetitive effects of these

vertical agreements outweighs any procompetitive justification.

185. Beginning some time before but no later than December 1, 2016, the exact date being unknown to DPPs and exclusively within the knowledge of Defendants, Defendants entered into continuing vertical contracts, combinations, and conspiracies to unreasonably restrain trade and commerce in violation the Sherman Act (15 U.S.C. §§ 1, 3) by artificially reducing or eliminating competition for CCELL-branded Vapes sold directly to DPPs and members of the putative Class and Sub-Class.

186. Defendants' anticompetitive and unlawful conduct has directly and proximately caused injury to DPPs and members of the putative Class and Sub-Class by restraining competition and raising, maintaining, and/or stabilizing the wholesale price of CCELL-branded Vapes at levels above what would have occurred if competition had prevailed.

187. As a direct and proximate result of Defendants' conduct, DPPs and members of the putative Class and Sub-Class were damaged—they paid more for CCELL-branded Vapes than they would have absent Defendants' anticompetitive conduct—in an amount to be proven at trial, and DPPs accordingly seek treble damages, costs, and reasonable attorney's fees pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

188. In addition, Defendants' anticompetitive conduct should be permanently enjoined.

<u>**COUNT THREE**</u>
***Per Se* Violation of the Cartwright Act**
**Brought in the Alternative**
**(Cal. Bus. & Prof. Code §§ 16720, *et seq.*)**
**(On Behalf of DPP Chillworx and the California Sub-Class)**

189. DPP Chillworx incorporates by reference each preceding paragraph as though fully set forth herein.

190. DPP Chillworx brings this claim on behalf of itself and members of the putative California Sub-Class, and as an alternative to Claim One.

191. Defendants' conduct occurred in substantial part in the State of California.

192. Defendants engaged in horizontal and/or vertical restraints of trade in violation of

the Cartwright Act, which prohibits combinations of two or more persons' capital, skill, or acts to restrict trade or commerce.

193.    Both horizontal and vertical restraints are *per se* violations of the Cartwright Act. *See Mailand v. Burckle*, 20 Cal. 3d 367 (1978).

194.    Each Defendant sells CCELL-branded Vapes to members of the putative California Sub-Class at the wholesale level.

195.    Defendants' agreement to set a wholesale price floor for CCELL-branded Vapes sold in the United States and not compete for some or all of each others' customers is a horizontal and/or vertical agreement in restraint of trade that was entered into for the purpose of combining and conspiring to raise, fix, maintain, or stabilize the wholesale prices of CCELL-branded Vapes sold to DPP Chillworx and members of the Sub-Class during the Class Period.

196.    Because this Consolidated Class Action Complaint presents allegations of violations of the Cartright Act that are illegal *per se*, no allegations with respect to the relevant product market, geographic market, or market power are required.

197.    However, to the extent a relevant market is required for this claim, the relevant market for antitrust purposes is the wholesale market for unfilled Vapes in the United States, and Defendants collectively exercise market power in the relevant market.

198.    Beginning some time before but no later than December 1, 2016, the exact date being unknown to DPP Chillworx and exclusively within the knowledge of Defendants, Defendants entered into a continuing horizontal and/or vertical contract, combination, and conspiracy to unreasonably restrain trade and commerce in violation the Cartright Act by artificially reducing or eliminating competition for CCELL-branded Vapes sold directly to DPP Chillworx and members of the putative California Sub-Class.

199.    Defendants' anticompetitive and unlawful conduct has directly and proximately caused injury to DPP Chillworx and members of the putative California Sub-Class by restraining competition and raising, maintaining, and/or stabilizing the wholesale price of CCELL-branded Vapes at levels above what would have occurred if competition had prevailed.

200.    As a direct and proximate result of Defendants' conduct, DPP Chillworx and members of the putative California Sub-Class were damaged—they paid more for CCELL-branded Vapes than they would have absent Defendants' anticompetitive conduct—in an amount to be proven at trial, and DPP Chillworx accordingly seeks treble damages, costs, and reasonable attorney's fees. *See* Cal. Bus. & Prof. Code § 16750(a).

201.    In addition, Defendants' anticompetitive conduct should be permanently enjoined.

**COUNT FOUR**
**Violation of the California Unfair Competition Law**
**Brought in the Alternative**
**(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**
**(On Behalf of DPP Chillworx and the California Sub-Class)**

202.    DPP Chillworx incorporates by reference each preceding paragraph as though fully set forth herein.

203.    DPP Chillworx brings this claim on behalf of itself and members of the putative California Sub-Class and as an alternative to DPPs' Claim One.

204.    Defendants' conduct has occurred in substantial part in the State of California.

205.    California's Unfair Competition Law ("UCL") prohibits acts of unfair competition, which mean and include any "unfair . . . business practices."

206.    Defendants' conduct constitutes "unfair" business acts and practices because Defendants' practices have caused and are "likely to cause substantial injury" to DPP Chillworx and the members of the putative California Sub-Class that is not "reasonably avoidable" by them and is "not outweighed" by the practices' benefits to them.

207.    As more fully described above, the purpose and effect of Defendants' anticompetitive agreement(s) was/were to eliminate competition for CCELL-branded Vapes by setting a wholesale price floor for CCELL-branded Vapes and to not compete for some or all of each others' customers.

208.    Defendants' anticompetitive agreement(s) constitute(s) unfair business acts or practices within the meaning of the UCL in that the justification for Defendants' conduct is

outweighed by the gravity of the consequences to the general public.

209.    DPP Chillworx and the members of the putative California Sub-Class have been and are unable to avoid injury because CCELL-branded Vapes are only sold at the wholesale level in the United States by Defendants.

210.    Defendants' anticompetitive agreement(s) is/are contrary to public policy, immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. Any purported benefits arising out of Defendants' conduct do not outweigh the harms caused to the victims of Defendants' conduct.

211.    Defendants' conduct is also "unfair" because it is contrary to numerous legislatively-declared policies. Here, Defendants' conduct not only violates the letter of Sherman Act and the Cartwright Act, but it also contravenes the spirit and purpose of each of those statutes. The conduct threatens an incipient violation of each of those laws and has both an actual and a threatened impact on competition.

212.    Independent of prohibiting acts of "unfair" competition, the UCL also prohibits "unlawful" business acts or practices. The conduct alleged in this Complaint not only violates the Sherman Act and the antitrust laws of California. This unlawful conduct has significantly harmed DPP Chillworx and the members of the California Sub-Class.

213.    DPP Chillworx and the members of the putative California Sub-Class have suffered injury in fact and have lost money as a result of Defendants' unfair competition and violations of law in that they paid more for CCELL-branded Vapes purchased directly from one or more Defendants than they otherwise would have paid in the absence of that conduct. They are therefore entitled to the relief available under the UCL as detailed herein.

## **PRAYER FOR RELIEF**

WHEREFORE, DPPs request that the Court enter judgment on its behalf and on behalf of the Class (and where appropriate, California Sub-Class) defined herein, by adjudging and decreeing as follows:

A.    This action may proceed as a class action, with DPPs serving as the Class

Representatives (and where appropriate, California Sub-Class representative) and its counsel serving as Class (and California Sub-Class) Counsel;

B.  Defendants have engaged in anticompetitive conduct in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), and the California Cartwright Act and UCL, and that DPPs and the members of the Class (or where appropriate, California Sub-Class) have been injured in their business and property as a result of Defendants' violations;

C.  DPPs and members of the Class (or, where appropriate, California Sub-Class) recover damages sustained by them, as provided by the federal antitrust laws and the California Cartwright Act and UCL, and that a judgment in favor of DPPs and the Class and California Sub-Class be entered against Defendants in an amount to be trebled to the extent such trebling is permitted pursuant to such laws;

D.  DPPs and members of the Class (or, where appropriate, California Sub-Class) recover restitutionary relief to the extent such relief is afforded by any of the aforementioned laws;

E.  Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

F.  DPPs and members of the Class (or, where appropriate, California Sub-Class) be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

G.  DPPs and members of the Class (or, where appropriate, California Sub-Class) recover their costs of this suit, including reasonable attorneys' fees as provided by law;

H.   DPPs and the Class (or, where appropriate, California Sub-Class) are entitled to injunctive relief suitable to remedy Defendants' past and ongoing restraint of trade, including the following:

    i.   A judicial determination declaring the rights of DPPs and the Class (or, where appropriate, California Sub-Class), and the corresponding responsibilities of Defendants; and

    ii.   Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from violations of the law as alleged herein.

I.   Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification of this action and their rights to the Class (or, where appropriate, California Sub-Class) members; and

J.   DPPs and members of the Class (or, where appropriate, California Sub-Class) receive such other or further relief as may be just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), DPPs demand a trial by jury of all claims asserted in this Complaint that are so triable.

///

///

///

///

///

///

///

DATED:        January 8, 2026

/s/ Nathaniel C. Giddings

Nathaniel C. Giddings (*pro hac vice*)
**HAUSFELD LLP**
1200 17th Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
ngiddings@hausfeld.com

*Counsel for Plaintiffs Earth's Healing, Inc. & Redbud Roots Inc.*

Christopher L. Lebsock (#184546)
**HAUSFELD LLP**
580 California Street, 12th Floor
San Francisco, CA 94101
Telephone: (415) 633-1908
Facsimile: (415) 358-4980
clebsock@hausfeld.com

Joshua H. Grabar (*pro hac vice*)
Julia C. Varano (*pro hac vice*)
**GRABAR LAW OFFICE**
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Facsimile: (267) 507-6048
jgrabar@grabarlaw.com
jvarano@grabarlaw.com

*Additional Counsel for Plaintiffs Earth's Healing, Inc. & Redbud Roots Inc.*

/s/ Dennis Stewart

Dennis Stewart (#99152)
**GUSTAFSON GLUEK PLLC**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 595-3299
dstewart@gustafsongluek.com

*Counsel for Plaintiff Chillworx, LLC*

Michelle J. Looby (*pro hac vice*)
Daniel C. Hedlund (*pro hac vice*)
Bailey Twyman-Metzger (*pro hac vice*)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
mlooby@gustafsongluek.com
dhedlund@gustafsongluek.com
btwymanmetzger@gustafsongluek.com

*Additional Counsel for Plaintiff Chillworx, LLC*